## GREENWELL v. ROSS et al.

*(Circuit Court, E. D. Louisiana.    March 26, 1888.)*

**1. SHIPPING—CHARTER-PARTY—BREACH OF CONTRACT.**
   A charter-party provided that the charterer should have the option of can-
   celing it, if the ship was not ready for a cargo of "lawful merchandise" on
   or before a certain day, and that he should have notice of such readiness.    It
   appeared that at 2:50 P. M. of the day fixed, and while the ship was hunting a
   landing, so that notice could not be speedily delivered, the charterer first gave
   notice of his intention to ship grain, which was shown to be "lawful," but
   not "general merchandise," requiring special preparations to make a ship
   ready for it.    The ship was ready for a cargo of "general merchandise," and
   the requisite notice given the charterer at 4:12 P. M. of the day fixed.    *Held,*
   that the ship complied with the charter-party, and that the charterer's refusal
   to furnish cargo was a breach of contract, the notice of intention to ship grain
   not being in reasonable time.

**2. SAME—REFUSAL TO LOAD—MEASURE OF DAMAGES.**
   In an action for refusal to furnish cargo according to the terms of a charter-
   party, libelant may recover for difference of freight between a cargo ob-
   tained and that contracted for, less freight refused because of space occupied
   by extra fuel required to make a longer voyage, but not for expenses incurred
   to fix defendant's liability, the ship being unconditionally refused, nor for
   demurrage, when the ship was loaded in less time after the contract was re-
   pudiated than was allowed by the charter-party.

**8. SAME—OFFER TO LOAD AT LOWER RATE.**
   In an action for refusal to load a ship according to the terms of a charter-
   party, where defendant afterwards offered to take the ship at a lower rate,
   the difference between the two rates will be taken as the measure of damages,
   the case offering no better, and such a course being fair to both parties.

In Admiralty.    Libel for damages.    On appeal from district court.
Libel for damages for breach of charter-party, by Thomas George
Greenwell against Ross, Keen & Co.

*Jas. McConnell,* for libelant.

*E. W. Huntington* and *Joseph P. Hornor,* for claimant.

PARDEE, J.    The charter-party contains, among others, the following
stipulations, to-wit:

"That the vessel shall, with all convenient speed, sail and proceed to New
Orleans, or as near thereto as she can safely get, and there load under the rules
and regulations of the New Orleans Maritime Association, from the said mer-
chants, their agents or assigns, as customary, a full and complete cargo of lawful
merchandise at the option of the charterers.    Fourteen weather working days
are to be allowed charterers for loading said vessel, which time is to commence
on the day after the vessel is ready with clean-swept holds to receive cargo,
and written notice (with surveyor's certificate of readiness attached) given of
same to charterers.    Should the vessel not be ready for cargo, at New Orleans,
on or before the 28th December, 1883, the charterers or their agents have the
option of canceling this charter."

These provisions, taken together, show that under the contract the
ship could be refused, provided that the vessel should not be ready for
cargo at New Orleans on or before the 28th December, 1883; that the
ship was to be loaded under the rules and regulations of the New Orleans
Maritime Association with a full and complete cargo of lawful merchan-

dise at the option of the charterers; and that the time for loading was to commence from the day after the ship should be ready with clean-swept holds, and written notice thereof, with surveyor's certificate attached, should be given to charterers. From the evidence in the case there is a distinction to be noticed between general merchandise and lawful merchandise. Grain is included in the latter and not in the former. It is also to be noticed that for a cargo of grain special preparations as to readiness for cargo are required. As the vessel was to be in New Orleans ready for cargo on or before the 28th December, 1883, under penalty of cancellation of the charter-party, at the option of the charterers, and as the character of the cargo was also at the option of the charterers, it would seem that under the contract it was the duty of the charterers to give reasonable notice to the ship of the kind of cargo intended to be shipped, if the cargo intended was such as to require special preparations, in order that the ship should be ready to receive it. The ship was in New Orleans on December 28th, 1883, ready to receive a cargo of general merchandise, and charterers were notified thereof, in writing, at 3:50 P. M., and again notified in writing at 4:12 P. M. of that day; the latter notice having attached surveyor's certificate of readiness for general cargo, the latter executed at 3:45 P. M. If the time of day at which this latter notice was served cuts any figure in the case, (which I am inclined to doubt, for the option of canceling retained by the charterers does not refer to the rules of the New Orleans Maritime Association, and the loading, not the arrival, was to be governed by said rules,) then I think it clearly established by the evidence that the delay was imputable to the charterers in not selecting an available landing; and that, even under these circumstances, the notice was given in time.

It seems under the evidence that the first written notice given by the charterers of any intention to ship grain was at 2:50 P. M. of the 28th, at the time that the ship was hunting a landing, and when it could not be speedily delivered; and was not in reasonable time to prepare the ship for grain, if notice of readiness, with surveyor's certificate, was required to be given in writing, and was also required to be given to the charterers previous to 4 P. M. of that day. The evidence is somewhat conflicting as to any verbal notice being given of an intention to furnish grain for the part or the whole of the cargo. The conversations of defendant Ross with Foster, clerk of the ship's agents, even if expressing a fixed purpose to furnish a cargo of grain, cannot be considered as notice to the ship; and by Mr. Ross' evidence, he was not then clear in his statements to Foster. He says in his examination in chief: "The night of the 27th I told Mr. Foster that if I had to load the Lemuria, that I intended to ship grain on her." On cross-examination he says he told Foster that he should give her a part cargo of grain. This is indefinite, and, if the conversation took place as stated, it bound the charterers to nothing, much less the ship. The next verbal notice claimed by the charterers was in conversation between Mr. Ross and Mr. Hall on the 28th December, sometime between 12 o'clock M. and 2:30 P. M. I do not find that Mr. Ross testifies specifically as to what was said in this conversation, but

v.34F.no.8—42

that, in general terms, he gave notice of intention to load the steamer with grain. Mr. Hall testifies that Mr. Ross in conversation said that he might give her grain, but that the written notice of 2:50 P. M. was the first information that he had of the positive intention of the charterers to load the ship with grain. The entire evidence on the subject of verbal notice leads me to the conclusion that at no time previous to 2:50 P. M. of the 28th did the charterers communicate to the ship's agents any positive intention to ship grain, and even to doubt whether they had any such intention in their own mind. This conclusion is supported by the fact that in the written note of 9:50 A. M. nothing is said in regard to cargo. And it may be said with regard to this notice, that while it intimates that at that time no wharf had been engaged for the Lemuria, Lincoln, of the firm of Ross, Keen & Co., testifies that at 7 o'clock on the morning of the 28th he had procured an assignment from the harbor-master for the Lemuria outside of the "Hector," and within an hour, to-wit, by 8 o'clock, he had reported the fact to the office. The conduct of the parties, and the conflicting evidence in the case, is only explainable by the fact that rates of freight had fallen since the charter-party was executed; the ship had been delayed, her agents and master were making strenuous efforts to save the charter-party, while the charterers were anxious to cancel the charter-party, and were throwing such obstacles in the way as a technical construction of the charter-party would seem to permit. On the whole case I conclude, as did the district judge, that in substantial compliance with the charter-party, the ship Lemuria was at New Orleans ready for cargo on the 28th day of December, 1883, and that it was a breach of contract for the charterers to refuse to furnish cargo according to the terms of said charter-party.

The damages claimed by libelant for this breach of contract are made up of the difference in freight as per freight list actually obtained, and freight as per charter-party, to which is added the difference in commissions, insurance, and in price of coal at New Orleans and at Halifax, three days' demurrage, notaries' fees, court fees, and stenographer's charges, all amounting to $3,024.12. Undoubtedly the difference of freight between the cargo obtained and the one contracted for furnishes the best rule for the ascertainment of the amount of damages. To be conclusive on the parties, however, the cargo obtained and the voyage should be substantially the same as provided for in the charter-party. These conditions do not exist in this case. The charter-party provides for a voyage to a direct port in the United Kingdom or on the continent, with deviation to Halifax for coal; and that the vessel should take sufficient coal at New Orleans to steam all the way from New Orleans to Halifax, and no more; and that the whole of said steamer, including all securely covered spaces on deck, and any ballast tanks arranged for cargo, with the exception only of the captain and officers' cabins, engine and boiler houses, engine-room, ordinary side bunkers, the necessary room for the accommodation of the crew, and the storage of the sails, cables, and provisions, shall be for the sole use, and at the disposal of the charterers for cargo. The voyage actually made, and for which cargo was obtained, was di-

rect to Liverpool, without deviation to Halifax, and much cargo space (as specified in charter-party) was necessarily taken up by the additional amount of coal required to steam all the way to Liverpool. The libelants' bill shows that this additional amount of coal amounted to 200 tons, and the evidence shows that freight was turned away from the vessel, and that that amount of space utilized would have realized about $1,000 additional freight charges. The stipulation in regard to coaling at Halifax was in favor of charterers, and to the detriment of the ship, as it increased the cargo's space, and necessarily prolonged the voyage, with port charges at Halifax. The less price of coal at Halifax was a point in favor of the ship, but the advantage was offset by port charges and expenses.

Under this state of facts I am at a loss to understand how the libelant can claim as a part of his damages the difference in price of coal at New Orleans and at Halifax. Nor do I understand why the damages should be enhanced by notaries' fees, court's fees, and stenographer's charges. The libelant was at liberty to incur such expenses; but, as the ship was unconditionally refused at 4:12 P. M. of the 28th, such expenses to fix liability were wholly unnecessary. Any other view would defeat libelant entirely, for the notice of 2:50 P. M. of the 28th required the ship to get ready for a part cargo of grain, and she was never so fitted and tendered. Under the charter-party the cargo was to be loaded under the rules of the New Orleans Maritime Association, and 14 weather working days were allowed in which to load the vessel. Under this contract and the said rules, weather working days do not include Sundays, nor holidays, nor days on which business is interrupted by weather; and said rules provide further that rain during working hours previous to noon shall prevent that day from counting; rain after noon previous to 4 P. M. shall prevent that half of the day from counting. Under the evidence, and applying the said rules, and counting December 29th as the first day, the loading of the Lemuria after the charter was repudiated, did not consume 14 weather working days, so that it would seem that the repudiation of the charter gave rise to no claim for damages by way of demurrage.

There is evidence in the record that after the repudiation of the charter, the defendants offered the agents of the ship £40 (5 shillings less than price in the charter-party) per net registered ton, other conditions similar to previous charter-party. This offer was not accepted by the agents of the ship. It is urged in this case, by the libelant, that this offer shows that the charterers refused the vessel for no other reason than the decline in freights. The defendant Ross testifies: "We made this offer for the express purpose of limiting any loss that might arise should a lawsuit be entered for damages, which we were informed was intended." The district judge took this offer as made in good faith, and as the best guide, under the circumstances of the case, in fixing the damages to which the libelant was entitled for breach of contract. It certainly is a guide to which the defendants cannot object. If we take libelant's bill and eliminate therefrom the amounts charged for coal and demurrage,

and deduct $1,000 for loss of cargo by taking coal in New Orleans,—three deductions which should certainly be made,—we have nearly the same amount as we obtain if we take the offer of the defendants, above stated, as determining the damages. Therefore, as the amount of damages as determined by the said offer is fair to the defendants, not unjust to the libelant, is the best the case offers, and was approved by the district judge, it will be taken in this court as the basis for a decree. This fixes the libelant's damage at 5 shillings sterling per net registered ton of the ship. Let a decree be entered in this case in favor of the libelants for $1,296, with 5 per cent. interest thereon from January 15, 1884; the defendants and their sureties to pay the same, together with the costs of the district court; the libelant to pay the costs of transcript and of this court.